We have arrived. Here to prepare the occasion is Honorable Appellate Court for the 2nd Judicial District. We will now back in session as soon as we can. The Honorable Assistant Attorney for the District of Columbia. Please be seated. This case is adopted 2-16-0158. Brian Corrigan, plaintiff's attorney. The Holy Angels Parish and the Buffalo & Sons Lawfare Incorporated are defendants and attorneys. Arguing on behalf of the attorney, Mr. Daniel E. O'Brien. Arguing on behalf of the attorney, Ms. Allison Harrington. Also arguing on behalf of the attorney, Mr. Joshua G. Vincent. All right, and we understand that there has been a decision on separating certain time for purposes of argument? Yes. Thank you. All right, Mr. O'Brien. Thank you. May it please the Court. Good morning, Your Honors. Good morning. My name is Daniel O'Brien and I represent the appellant, Brian Corrigan. We come here with this case, and I believe this is a case involving a contractual assumption of a duty. I believe that it is similar to the Eichler v. Cliff Eaters case. We've argued it significantly in our briefs. The difference is that this is an oral agreement here and not a written agreement. And the key, I believe, oral statement or admission by Michael Butler was that he agreed that it was his responsibility to salt the parking lot at Holy Angels Church anytime there was ice on the parking lot. Mr. O'Brien, can I ask you a special question? This is not a claim that there was something done that caused an unnatural accumulation of ice on the property, right? I don't believe so. And if I may explain that, Your Honor, the only reason I say it that way, and I said this in the lower court, there's not a lot of evidence in this case about an unnatural accumulation. The only potential evidence in that, there's testimony from Mr. Butler that he had been out at the parking lot at approximately 5 a.m. that morning when it was dark, and he had salted the lot. He didn't check to see if he salted the entire lot. When you couple that with the testimony that just before the second of two funerals that morning, there were large sheets of ice, that Mr. Corrigan was wearing black clothing, there was no salt residue anywhere on his clothing, despite having to crawl on the ice to get off of it to be able to walk, suggests that there's some evidence that the entire lot was not salted. I bring this up only that I see some conflict in cases talking about the snow plow or salters' duties, what consists of negligence or not. Some case law says that evidence of negligence, you have to show that the contractor created an unnatural accumulation. I think that's really the weight of the law. Under the common law, only unnatural accumulations of snow that is caused by the property owner or their agents would be a ground for liability. That's the reason I asked the question. Did he fall? Are you saying that he fell because the agents or the property owners did something with the ice or the snow to make the thing hazardous? Or are you proceeding simply on a contractual obligation to do something that wasn't fulfilled? I think under either of your questions, it's based on the contractual obligation to do something that wasn't fulfilled. The only other case I would mention is Williams v. Seabird Landscape, where the 1st District Appellate Court stated that the only thing you have to prove against a contractor is that the contractor acted negligently or failed to act reasonably. Whether this was ice that was newly formed before the second funeral on that day by Mr. Butler's admission, he had an obligation to come out any time there was ice on the parking lot. It's undisputed that there were large sheets of ice on the parking lot at that time. Or under the other scenario that it was negligently salted at 5 a.m. that morning, I think that's another option under the Williams v. Seabird Landscape case. I think you would have to show something. Follow this logic. You contract with a third party to do something, okay? And the third party doesn't show up. Let's say, for example, they didn't do anything and somebody falls. Are you saying that the landlord would be liable to the third party even though nobody came out and did anything because they had an obligation to do something? Is that what you're saying? I think that that's what Eichler says. Eichler involved a parking lot, and in that case, the plaintiff's appellants acknowledged it was a natural accumulation of ice. They were going to the movies at Fox Valley Mall, and they slipped on the ice, and there were contractual obligations to remove the ice. And in this case, there was a contractual obligation, admittedly so, to salt the parking lot any time there was ice on the parking lot. So I see those as... You don't see a conflict of that. The owner has no obligation. I think you contestably conceded that. To remove a natural accumulation doesn't do anything at all. It just watches the snow come down. But they contract with somebody to do something, and they don't show up at all. And the situation is exactly the same as it would have been if they didn't hire a third party. You're saying there's liability there? There's liability against the third party I think for sure under the law. They didn't do anything. For nonfeasance. And I think what the Eichler decision says is that if there was reliance on the part, if you apply Eichler stricter than maybe I'd like to argue it at certain points, that Holy Angels had a right to rely on Butler & Sons to come out and salt the lot whenever there was salt on the parking lot because that was Michael Butler's understanding of his obligation, that the plaintiff, Brian Corrigan, can rely on that reliance. He doesn't have to prove his own reliance. So I think Eichler, while I think it supports strongly the case against Butler & Sons, I acknowledge Your Honor's questions on this. It may not be as strong against Holy Angels. The only other factors I would say as to Holy Angels on that point, Your Honor, is that there was testimony that both Mr. and Mrs. Corrigan advised the bereavement individual, Sue Ellis, about that he slipped and fell on the ice. And it's a hearsay exception, I believe, that she acknowledged to them that somebody had complained of ice on the lot before the first of the two funerals earlier that day and nothing was done about it. I think that created some obligation based on Michael Butler's understanding of this agreement for the church. Well, he said he was there at 5 a.m. Yes. And now we have, and he salted. I think we all know that when you salt, if the salt works, it becomes a little, it starts to get softer. And with the use of cars for a funeral, it becomes slushy as it ruts. Now it freezes up again because there's time in between. Does Mr. Butler's obligation come to checking to make sure the ruts haven't frozen or that it hasn't refrozen because it thawed and then somebody else used it, which caused a problem, and now it has to come out again? Where is, since this is oral, which is a difficult situation, where does that stop? How far can we go back? Every time he sees a crystal, he has to put ice on it or salt on it. Pardon me. Right. Understood. Salt the ice. I was doing that too. My answer to that, Your Honor, would be on a day like this day when it's a Saturday and the church has an early morning mass and then two funerals scheduled, I think on a day like that when it's an icy, wintry day, there is an obligation to go back out and make sure that what you did, and his testimony was he knew about the early morning service or mass, but he knew or should have known about these two funerals scheduled that day and then he should have gone out to see that the parking lot was safe. He understood that his obligation, his oral agreement, was for the safety of the patrons going to the church. So by his own admission— Counsel, how would he know there were two funerals? Well, there's a— This is an oral agreement that we're— It's an oral agreement. He's a parishioner there. It's his sister that he had the oral agreement with. The weekly pamphlet would have a schedule for the church. Not a funeral. We don't plan deaths, not yet. Well, but I think the church— I don't mean to be facetious, but how would he know? If there's a wedding, maybe I would agree with you. But how do you know there's a funeral? I think by— Until the day before or such. And where in the oral agreement would we find an obligation for him to pursue that or to know that? Or Sunday morning? These are the standard masses. I see your point, but how does he know about a funeral? I think he should know. I think as part of—since we're dealing with an oral agreement, I think it's something that he should know, whether that's an obligation on the church also to advise him. If this incident happened on a Monday night where nothing was going on and my client simply slipped on the parking lot— Yeah, but I mean, there could be something at any time. But you're using Monday after Monday night. Would there be an assumption that there's nothing going on on a Monday? Why wouldn't there be an assumption that there's nothing going on on a Saturday morning, mid-morning? Well, I don't think that—I think if your understanding is that your agreement, for the safety of patrons at the church, I think it's a reasonable slight extension of that to know the schedule of what's going on. And there are often funerals, I think Saturday. I mean, if there are two funerals, it's not a hard fact to determine. It's not a—the burden of determining those facts is not— It's a burden, but we're hanging our hat on this contract. That's what gives rise to any liability, if at all. How do we extrapolate out of that oral contract to salt when there's ice to say that in addition to that, you now need to know when there's activities that are not the standard ones, every Sunday morning kind of thing? It just—and maybe we just agree to disagree and move on on it. I don't want to use all your time. Well, I'm not trying to agree to disagree with you on anything, Your Honor. Just that I don't have an easier answer than I think it's— Even now, it's a logical extension. You're saying that's what you're hanging your hat on. Yes. Okay. All right. It was a fact that would have been easy to determine. It wouldn't have been a phone call, a conversation with his sister. If we're taking all the facts just in this case, I guess my point in answering that, Your Honor, was that if this were a Monday night with nothing scheduled, then it's a different case, I believe. I think you look at the facts— But would he have to call on Monday afternoon to see if there was anything scheduled? I think that there was evidence in the case about what the schedule was that week, and that did come out. He certainly knew about the early morning mass. I think that's a reasonable— But that's why—if there's a 7 o'clock mass, that's why he's sorting at 5. I think it's a reasonable extension of his oral understanding. If he's going to do this for the safety of the patrons, anytime there's ice on the parking lot, then he should make an inquiry. He was a parishioner. He didn't live far away. I don't think it would have been a difficult obligation. You keep saying he is doing this for the safety of the parishioners. Isn't he actually doing this contractually for Holy Angels, and that entity is doing it for the safety of the parishioners? In fact, does Mr. Butler or Butler Lawn Care, did he make any guarantees to any of the parishioners that I will always keep this parking lot clear? Well, his testimony was that he understood what he was doing, that the job of salting the parking lot was for the safety of the patrons and parishioners. But he wasn't contracted to them. He was contracted to Holy Angels, correct? Yes, that's true. And so if we're talking about a duty, would it be Holy Angels that has the duty, or by this contract, would it be Mr. Butler? Well, I think by the contract, Mr. Butler has the duty. And Holy Angels, and what they've argued in this case and testified to, was we entirely relied on Mr. Butler. We entered into this agreement, and we relied on him or his company to determine when the parking lot needed to be salted or shoveled. They had their own janitor who was out there the morning of this occurrence and salted the stairs of the church and the sidewalk, and there was some testimony that those appeared heavily salted that day. And he testified that he was not instructed to ever walk across the street to this parking lot, which was the main parking area for this church, if anybody's ever been to Holy Angels. That's where you park, and the entrance is across the street. So they had every opportunity, and when I say they, I mean Holy Angels, to have determined the condition of this parking lot from the testimony of my clients about Sue Ellis, the bereavement individual, to Mr. Richards, the janitor, to have easily determined this. But their position is we relied entirely on Butler to safely salt that. And that's their position in this case. Were there any other conditions that might have contributed to this situation? In the Kittle case, it was lighting. It was poor lighting. This was daytime, right? So we don't have anything else. It wasn't foggy. It wasn't overcast. No, the only thing I would say, Your Honor, to that, those cases talk about illumination. So illumination, the only thing I would say is the testimony in this case is that the sidewalk and stairs right in front of the church, which is right across the street from the lot, appeared to be heavily salted, and the parking lot did not appear to be as heavily salted, or it appeared to be wet. So whether, if it's a stretch to say that there's a big drop-off or a difference between the condition of the stairs and the sidewalk and then the parking lot, I think you can extend that to that Kittle versus Liss argument that there has to be some consistency in a safe means of ingress and egress. Well, what about the street? I mean, there are circumstances where I felt prey and felt injured in Belvedere trying to get from the parking lot to the courthouse to the courthouse. The street was a sheet of ice, and I went downhill right under my car. I mean, you know, so there were other things there that might have caused a fall, although we know he was on the parking lot, correct? Correct. That's not in dispute. And it's not in dispute that that was the property of the church. You know, I think that in this case, my thought in this case is that from other cases that both this Court has heard, including claims some that I know Your Honor authored, I think we have a definitive contractual agreement to come out and salt the parking lots any time there was ice on the parking lot, and the evidence of that is undisputed that at the time of this occurrence there was significant ice on the parking lot, much like in Eichler. We're not talking about little chunks of ice here and there, but big sheets of ice, and I think that was a deciding factor in Eichler, and I think it should be a deciding factor in this case. Thank you, Your Honor. You'll have an opportunity to reply if you wish. All right, who would like to go first? Ms. Harrington. May it please the Court? My name is Allison Harrington. I represent Butler and Sons in this matter. To cut really right to the chase to me that this case is all about is this alleged assumption of a contractual duty, and the analysis of the Eichler case, and within the Eichler case the Court addressed the Burke case, which I think are very supportive, in fact, of Butler and Sons in this matter. In Eichler, and in how they discuss in Burke as well, there is very specific contractual language that was unambiguous that led the Court to abrogate the common law and extend or allow this or find that there was an assumption of a contractual duty. In this case, as the Court has identified already clearly, that what we're dealing with is an oral agreement. There is no specific written contract. There is no specific language for us all to look at to determine whether there is this assumption of the duty. What we have is the conduct of the parties and the deposition testimony that both parties have brought forth to the Court. And in this matter, what we have is the conduct of Butler and Sons and the deposition testimony of Mr. Butler, where he indicated and said that he told the Holy Angels Church that he would go out and salt any time it snowed. Later in the deposition, and what counsel is relying upon, I believe to support entirely the argument that there was an assumption of the duty to remove ice in this case, is the deposition testimony, and the question and the answer was that your understanding of performing the salting services for Holy Angels Parish, that any time there's ice on the parking lot, you were expected to come out and salt the lot. And the answer was yes. To me, the distinction is in the specific language that was used in that question and answer, because that's what Eichler did. When they looked at this contractual language in that case, there was specific contractual language that said they would agree to remove all snow and ice, and other materials in between that statement. In this case, all that statement says is that Butler and Sons has agreed to salt. There is no agreement in that statement to remove all snow or ice. So you're saying, just to put a fine point on it, here, unlike the property owners in Eichler, Holy Angels and Butler made no promise to remove snow and ice from this property. Is that the distinguishing factor here? The distinguishing factor is yes. There was no promise. Correct. That what the promise or the agreement between the parties was to come out and plow when there was more than two inches of snow, to come out and salt when it snowed. And even if we use the language that counsel is attempting to say establishes its duty to always remove ice from this parking lot, it doesn't say that we've agreed to remove all ice. It simply says we are agreeing to salt. That's what the agreement was. And the original agreement even had that, the written agreement had that crossed out, correct? Correct. But it only became an issue when the equipment that was owned by Holy Angels broke down and somebody had to put out. Correct. I'm going to do it again. You don't put the ice out, you put the salt out. Somebody had to put the salt out, and so they turned back to Butler. Correct. Okay. So there was an initial time where Butler did provide that service, and then the church attempted to save costs and were going to do it themselves, and then you're correct. And then there was a year, I believe, and then Butler and Simon actually did a return to doing that work. So my point ultimately is that it's my position in this case that the case law that counsel is attempting to rely upon from this district in Eichler is really supportive of our position in the sense that there was no contractual agreement to do what he's claiming we agreed to do. Yes, there was in Eichler. Correct. So your bottom line with Eichler and corollarily Burke is that you follow the terms of the contract. Yes. And here the duty was determined or limited by the terms of this oral agreement, which can be reduced to about 12 words. I plow if there's more than two inches of snow, and I salt when there's ice. Correct. But is it a reasonable extension to say you salt all the time that there's ice? And ergo, if ice developed between 5 a.m. and the beginning of the 11 o'clock funeral or minutes before, was it an extension of this albeit very limited contract to salt again? Right. And I think actually the Eichler matter, the opinion towards the end, addresses that specifically. And where I believe based upon the clip, which was the movie theater, that they made an argument that if you take the argument, for instance, that they're going to be out there and salt any time there's any ice that develops, we are taking the assumption or this assumption of a duty to an absurd result. And I believe that's also addressed in Eichler towards the end of that opinion. And I would agree with that because what are we asking somebody to do under these circumstances is after you've already salted from goodness, here, it could be any time, maybe in October, not this year I guess, but all the way through spring, that this individual should have to make sure that there's never any ice that develops in that parking lot. We have an overlay of what's reasonable under the circumstances. So as counsel says, it may be an extension of the contract to salt all times, but all times is judged in terms of what's reasonable. Absurd being one end, maybe once a day, once every 12 hours, being on the other end? Well, I think that there's even a more specific distinction to make as to the statement in the deposition testimony in that, again, the agreement is that they will salt when there's ice. And do I believe ultimately the argument being that they would have to be there at any time would lead to an absurd result? Yes. But that, if you're going to follow Eichler and Berg, they were looking at those very specific terms of those agreements, and they were unambiguous, and that created the duty. Here, there is no specific agreement to remove all ice, and that looks at, then, the Berg case, where I think the 2nd District relied heavily on that 1st District case, where it talked about this idea for the city of Chicago at the airport that you could not go ahead, okay, that in the Berg case, that in order to determine in that case that the plowing was defective, that in order to support a breach of duty, that the court would have to interpret the agreement to include a duty to remove all snow, and the court said the agreement did not include that. And so as a result, in interpreting the specific unambiguous terms, the court determined that there wasn't that assumption of the duty, if that makes sense. Yes. All right. Thank you very much. Thank you. And Mr. Vincent? Good morning. I'm going to please the Court, Joshua Vincent, on behalf of Defendant Holy Angel's Parish. I guess I'll just lead off where everybody seems to be at, and that's the question of the contract. And, you know, I think the Plans Council basically conceded that there really isn't any contract term here that implicates the Church. I mean, when you look at the circumstances here in the testimony, there's no, the Church didn't undertake, there's no testimony, no evidence whatsoever that the Church agreed to inspect, that the Church agreed to contact Mr. Butler when it needed his services, that the Church did not supervise Mr. Butler in any way, shape, or form. They didn't supply him with any of the equipment or salt or tools that he needed to accomplish this. The only obligation that the record indicates the Church had was simply to pay Mr. Butler. That was it. The Church didn't undertake anything itself or the staff to do anything that caused financial accumulation of ice, did they? Correct. And that's, you know, and to me, so, I mean, from the contract standpoint, there's absolutely nothing that the plaintiff can point to that imposes any obligation or undertaking by the Church to do anything. So there's no contractual basis to create some assumption of a duty in this case with respect to the Church at all. There's zero. It's identified none. Is there any reasonable expectation, which I know is not the language of this, of our duty or issue here, but is there a reasonable expectation that when you hire somebody to do this, it will be done and therefore your parishioners are going to be safe? Well, let me talk about that in two ways. You know, one is in the Claims I case that I know Justice Jorgenson authored, there is a discussion of this nonfeasance theory. And I think it may be, other than the Chisholm case that's discussed in the Claims I case, as far as I can tell from our research, that's the only two instances where nonfeasance has ever been discussed in the state of Illinois. I mean, I think it would be extraordinary to suggest that somebody, simply by contracting to hire someone to remove the ice and snow, and if they fail to do it, as Justice Hudson pointed out, that suddenly you're liable that they just didn't show up to do it. So the nonfeasance thing, and even in that context, that case points out that that is a very narrowly construed theory. And second of all, even in the context of Chisholm, where nobody is liable to find liability, but in the context of that case, it talks specifically about how there has to be consistent reliance by the plaintiff, an expectation that it's always been done. There's no evidence of that in this case whatsoever. There's evidence that the plaintiff came to Holy Angels Church on other occasions for other services and so forth, but there's no indication he ever came there before in the winter, that he ever came there before, the expectation that snow and ice would always be removed from the parking lot. And the other component of that case, besides that sort of reliance, you know, through a course of consistent history, and even in Claims 1, where the caretaker in the past himself testified that he had removed snow and ice from the stairway, even that wasn't enough in that case to create the reliance. So we don't have anything close to that here. And then the other component is it somehow has to be a hidden condition that you can't find, and this was about as open and obvious as you could get. You know, the plaintiff testified he could see the wet spots in the parking lot, so it wasn't an undiscoverable type of condition. So that's nonfeasance theory is so obscure, so narrow, has never been applied to find liability, I think that that would be a real extreme decision or result from a public policy standpoint to find that. I think the other thing that's really significant, and I think Justice Hudson, you touched upon this a little bit, is all of these cases where we're talking about an assumption of duty, a voluntary undertaking, whether it's by contract or some other way, you have to have performed it negligently. There has to have been something you did to make the situation worse than it was if you had done nothing. That's why this nonfeasance theory is such an oddball theory to me that doesn't seem to fit anywhere in Illinois law. So from the standpoint of consistently in any tort concept, putting aside this sort of premises liability area with slip and fall, there are many other circumstances in Illinois law where we talk about duties that are assumed, voluntarily assumed duties, but consistently across the board, it has to have been performed negligently and created a hazard. There has to be some fault. Make the situation more dangerous. Make it worse. And that's utterly absent in this case. There is no evidence whatsoever that whether he salted or he didn't salt didn't make any difference in this case. It didn't make anything worse than it already was. I mean, if it's salted and whatever was there melted and refroze, that's a perfectly natural condition. And there's case law that says if you salt and it later refreezes, Justice Hutchinson, you were pointing out, cars drive over it, things happen, the salt gets dissipated, maybe it blows away, who knows. It refreezes. It's all a natural condition. This is not the result of someone's fault or negligence that that occurs. And the same is true if he didn't salt. If he didn't do anything, we're back, I mean, we've come full circle. Now we're back to a completely natural condition again for which there is no liability. So I'm just not sure. It's almost circular, the argument in that context. So I think ultimately what I would say is, A, there's clearly no contractual basis whatsoever to hold Holy Angels liable here under some voluntary undertaking. They wouldn't undertake to do anything. Number two, he can't show that we actually did do anything, nor can he show that Butler and Sons did anything to me. This condition works. He can't show that there was any other condition, as you pointed out, Justice Hutchinson, apart from the ice that contributed to this fall. It's not like the case with the loose stones under the snow. It's not like the case with the bad lighting. There's no other condition on the property that contributes to this, so there's no basis there apart from the natural accumulation. And then finally we come back to the question of public policy. And even the Supreme Court has recognized, and a long time ago, but I think it still holds true in our area of the country, that we want people to go ahead and take the affirmative step to hire people to remove their ice and snow. And that's something to be encouraged. That's not a reason to hold the church liable because we hired somebody to remove the ice and snow for the convenience of the parishioners. Now, again, if we had gone out there and done something that made it worse or created a hazard and had some fault, then I can see it. But that's what's really ultimately lacking in this case. There's no fault shown. There's no evidence of fault whatsoever. So does the Court have any other questions? No. Thank you. Thank you. Mr. O'Brien. If I can just briefly respond to a couple of things that counsel just mentioned, and this was what I brought up earlier. I think there's a little bit of a conflict on case law.  There's first Eichler and then Williams v. Siebert. Williams v. Siebert says that all you have to show as a plaintiff, you have to establish ordinary negligence against the snow and ice contractor. There's other cases out there that talk about what counsel just said, that you have to show they made it worse. That's not what Williams v. Siebert landscape says, and that's a 2011 decision. Well, actually, he's arguing that the church wasn't negligent at all because they had no obligation. So I guess is your argument then going to Butler and Sons? That argument goes more to Butler and Sons. And the nonfeasance reliance argument in Eichler, Eichler did deal with 324A, the restatement second of torts that deals with the issues of misfeasance, nonfeasance. It's just that the decision in Eichler didn't dissect it as much, but it did talk about you don't have to show a plaintiff's reliance that the parking lot would be salted adequately and be safe if you can show that the property owner relied on that. And there is a significant amount of evidence that Holy Angels relied on Butler and Sons to make that parking lot safe for its parishioners on the day of this occurrence. But is there anything in this record where Holy Angels actually guarantees to its parishioners, you will be safe in our parking lot, you will be safe when you come to church? No, there's not. There's not. On the issue of there was some discussion about Eichler dealing with the removal of ice, and here we're talking about salting ice. I think in Eichler they said, although the contract said they'd remove all ice, we understand we're in Illinois and not every bit of ice has to be removed for that to be complied with. When you apply that to salting ice, I think they're synonymous. It's the same thing.  But again, just like in Eichler, we don't expect that every little bit of ice will be removed. But in this case, there's evidence of significant sheets of ice, just like there was that evidence in Eichler. And that's why I think these are so intertwined, admittedly stronger against Butler and Sons as opposed to the church. I don't think this is an absurd result. I think this case depends on the facts of this case. An absurd result would be if my client had fallen at 3 a.m. on a Monday night or sometime when there's not an expectation that anybody should be out there looking at this parking lot. The facts of this case create that expectation, and I think although we're dealing with an oral agreement, there was a specific admission that applied a duty under the facts in this case based on undisputed evidence of a significant amount of ice on this parking lot. Well, the admission in that deposition was that your understanding is you will perform salting services. And so you're saying salting services means removal. I think they're synonymous, yes. If you look at Eichler, at the end, as counsel brought up, Eichler, another thing that the decision in Eichler said was even though that contract said that they would remove all snow and ice from the premises, there wasn't an expectation that 100% of the ice would be removed, that that would be too much of a burden. If you apply that to this case saying you acknowledge a duty to salt the ice whenever there's ice on the parking lot, it would be the same. The anticipation is to remove all the ice, but if there's some, there's going to be spots here or there. That's a different scenario from what we have in this case where there were significant sheets of ice covering four parking spots as well as other areas testified to by the other witnesses. There was ice everywhere in this parking lot. I think that's evidence under both Eichler and Williams v. Seabird Landscape that the agreed duty to salt the parking lot whenever there was ice on there was performed negligently or not at all. Thank you. Thank you. Thank you very much for your arguments this morning. We're going to stand in recess to prepare for our next argument, and we will get a decision out in due course. Thank you.